**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**COLAKOGLU METALURJI A.S., *et al.*,**

**Plaintiffs,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**REBAR TRADE ACTION COALITION**

**Defendant-Intervenor.**

**Before: Hon. Claire R. Kelly, Judge**

**Court No. 20-00153**

**REBAR TRADE ACTION COALITION'S RESPONSE BRIEF**

**Alan H. Price, Esq.**
**John R. Shane, Esq.**
**Maureen E. Thorson, Esq.**

**WILEY REIN LLP**
**1776 K Street NW**
**Washington, DC 20006**
**(202) 719-7000**

***Counsel to the Rebar Trade Action Coalition***

**Dated: May 13, 2021**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 1

III. SUMMARY OF ARGUMENT ........ 6

IV. ARGUMENT ........ 6

A. Commerce's Methodology Is in Accordance with Law ........ 7

B. Commerce's Methodology Is Supported by the Requisite Factual Findings ........ 11

V. CONCLUSION ........ 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Corp. & Subsidiaries v. United States*,
821 F.3d 1345 (Fed. Cir. 2016)....3, 5, 8, 9

*Allegheny Ludlum Corp. v. United States*,
346 F.3d 1368 (Fed. Cir. 2003)....11

*Changzhou Hawd Flooring Co. v. United States*,
848 F.3d 1006 (Fed. Cir. 2017)....8, 9

*Ulasim Sanayi A.S. v. United States*,
No. 19-00149, slip op. 21-20 (Ct. Int'l Trade Feb. 19, 2021)....5

**Statutes**

19 U.S.C. § 1671d(c)(5)(A)....9

19 U.S.C. § 1671d(c)(5)(A)(i)....7

19 U.S.C. § 1671d(c)(5)(A)(ii)....7, 8

19 U.S.C. § 1673d(c)(5)(A)....8, 9

19 U.S.C. § 1677(5)....10

19 U.S.C. § 1677b(a)....9

19 U.S.C. § 1677f-1(d)....9

**Administrative Materials**

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 42,353
(Dep't Commerce July 14, 2020)....1, 2

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 84 Fed. Reg. 36,051
(Dep't Commerce July 26, 2019)....1, 2, 10

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 83 Fed. Reg. 16,051
(Dep't Commerce Apr. 13, 2018)....1, 10, 13

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 82 Fed. Reg. 26,907
(Dep't Commerce June 12, 2017)....1

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) ........................................................................................2

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014) ........................................................................................10

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) ........................................................................................13

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ................................ *passim*

## I. INTRODUCTION

On behalf of the Rebar Trade Action Coalition ("RTAC"), defendant-intervenor in this action, we respectfully submit the following response to the January 26, 2021 opening brief filed by plaintiffs Colakoglu Metalurji A.S. and Colakoglu Dis Ticaret A.S. (collectively, "Colakoglu"). *See* Pls.' Mot. for J. on the Agency R. and Mem. of Law in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 (Jan. 26, 2021), ECF No. 22 ("Colakoglu's Brief").

## II. BACKGROUND

This appeal arises from the fourth administrative review of a countervailing duty order covering steel concrete reinforcing bar ("rebar") from the Republic of Turkey ("Turkey"). The review covered imports made during calendar year 2017; the final results were published in the *Federal Register* on July 14, 2020. *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 42,353 (Dep't Commerce July 14, 2020) (final results and partial rescission of countervailing duty admin. rev.; 2017), P.R. 138 ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 135 ("Final IDM").

Prior to conducting the fourth review, the U.S. Department of Commerce ("Commerce") conducted annual administrative reviews covering the portion of 2014 that post-dated the affirmative final determination in the original investigation, calendar year 2015, and calendar year 2016. *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019) (final results and partial rescission of countervailing duty admin. rev.; 2016) ("2016 Review Notice"); *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 83 Fed. Reg. 16,051 (Dep't Commerce Apr. 13, 2018) (final results and partial rescission of countervailing duty admin. rev.; 2015) ("2015 Review Notice"); *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 82 Fed. Reg. 26,907 (Dep't Commerce June 12, 2017) (final results and partial rescission of countervailing duty admin. rev.; 2014) ("2014 Review Notice").

Colakoglu was selected for individual examination in the 2015 and 2016 reviews. In the 2015 review, based on its use of subsidy programs in that year, it received a *de minimis* margin of 0.18%. In the 2016 review, Commerce calculated a 1.82% subsidy rate for the company, based primarily on its purchases of natural gas from Turkish governmental sources for less than adequate remuneration. *See* Issues and Decision Memorandum accompanying 2016 Review Notice at 7-8.

The 2017 administrative review covered seventeen Turkish rebar producers/exporters, including Colakoglu. Final Results, 85 Fed. Reg. at 42,355.[1] Two companies, Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas") and Kaptan Demir Celik Endustrisi ve Ticaret A.S./Kaptan Metal Dis Ticaret Ve Nakliyat A.S. ("Kaptan"), were selected for individual examination. Respondent Selection Memo at 1-2. Commerce preliminarily calculated *de minimis* net subsidy rates for both mandatory respondents. *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) (prelim. results of countervailing duty admin. rev. and intent to rescind the rev. in part; 2017), P.R. 119 ("Preliminary Results"). To determine the preliminary net subsidy rate for Colakoglu, Commerce preliminarily brought forward the rate calculated for the company as an individually-examined respondent in

---

[1] Colakoglu's brief states that the review covered only four companies. Colakoglu's Brief at 3. This is incorrect. According to Commerce's respondent selection memorandum, review was requested for twenty-four companies. Mem. from Caitlin Monks, Senior Int'l Trade Analyst, AD/CVD Enf't, Off. VII, to Edward Yang, Senior Dir., AD/CVD Operations, Off. VII, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Respondent Selection in Countervailing Duty Administrative Review for 2017* (Apr. 26, 2019), C.R. 4, P.R. 28 at 2 ("Respondent Selection Memo"). Commerce later clarified that one of the companies for which review had been requested was not subject to the order. *Id.* at 3. Five other companies for which review was requested filed "no shipments" certifications. The review of these companies was accordingly rescinded. Final Results, 85 Fed. Reg. at 42,354. Finally, two of the companies for which review was requested were collapsed, and treated as a single respondent. *Id.* at 42,355; *see also* Respondent Selection Memo at 2.

the 2016 review. *See* Issues and Decision Memorandum accompanying Preliminary Results, P.R. 112 at 7-8.

Colakoglu challenged this methodology in its case brief. Letter from Arent Fox LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey; Colakoglu Case Brief* (Feb. 25, 2020), P.R. 123. The company argued that Commerce should determine its net subsidy rate for the 2017 review period by averaging the *de minimis* net subsidy rates determined for Kaptan and Icdas. In support of its claim, Colakoglu pointed to legislative history regarding Commerce's determination of antidumping duty margins for companies not selected for individual review. *Id.* at 1-2. Colakoglu argued that, by pulling forward a net subsidy rate from a prior review, Commerce had ignored this legislative history, as well as judicial precedent interpreting it. *Id.* at 2-4. Colakoglu also argued that Commerce had "skipped" an analytical step, in that the agency had not explained why averaging Kaptan/Icdas's *de minimis* net subsidy rates would result in a net subsidy rate that would be unreasonable to apply to Colakoglu. *Id.* at 2-3.

RTAC filed a rebuttal brief addressing Colakoglu's claims. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey: RTAC's Rebuttal Brief* (Mar. 2, 2020), P.R. 129 at 1-5. RTAC argued that Commerce's determination to pull forward Colakoglu's 2016 rate was appropriate, because the *de minimis* margins calculated for Icdas and Kaptan's 2017 shipments would not be a reasonable proxy for Colakoglu's own behavior. RTAC explained that Colakoglu had been found, in 2016, to use different subsidy programs than those used by Icdas and Kaptan in 2017. *Id.* at 2, 4. RTAC also explained that Colakoglu's claims were rooted in a misunderstanding of the decision of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") decision in *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016). *Id.* at 2-4.

In its Final IDM, Commerce explained that it intended to continue its preliminary methodology for determining the net subsidy rate for Colakoglu. Commerce explained that while Colakoglu had pointed to the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") as support for its preferred methodology, the SAA used different language in describing how the rates for non-selected companies should be calculated in antidumping and countervailing duty proceedings. Final IDM at 33 (quoting the Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I, at 873, 942 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201, 4251 ("SAA")).

The language cited by Colakoglu, which pertained to Commerce's determination of antidumping duty margins, states that where the dumping margins for individually-examined companies are all zero, *de minimis*, or based on facts available, the "expected method" for determining the dumping margin for non-selected companies will be to average the individually-examined companies' rates. *Id.* (quoting SAA at 873, 1994 U.S.C.C.A.N. at 4201). The language further states that if this method is not "feasible," or would not result in an average that is "reasonably reflective of potential dumping margins" for the non-examined companies, Commerce should use other methods to determine the non-examined companies' antidumping duty margins. *Id.*

By contrast, Congress did not provide an "expected method" for determining the net subsidy rates for non-selected companies in countervailing duty proceedings where the individually-examined companies' rates are all zero, *de minimis*, or based on adverse inferences. *Id.* Rather, Congress simply stated that Commerce shall use "any reasonable method" to determine the non-selected companies' net subsidy rates. *Id.* (quoting SAA at 942, 1994 U.S.C.C.A.N. at 4251). Commerce explained that Congress's provision of an "expected method" for calculating

non-selected respondents' antidumping duty margins, but lack of such provision with respect to calculating countervailing duty margins, indicates that the "expected method" restriction does not apply in countervailing duty proceedings. *Id.* at 33-34.

Commerce further explained that the Federal Circuit's decision in *Albemarle Corp.* was not apposite. *Id.* at 34. First, it involved an antidumping duty proceeding, not a countervailing duty proceeding. *Id.* It also focused entirely on the SAA's "expected method" language with respect to antidumping duty proceedings – language that is absent from the SAA's provisions regarding countervailing duty proceedings. *Id.* Beyond this, Commerce explained that there are substantive differences between antidumping and countervailing duty proceedings that indicate that *Albemarle Corp.* is not straightforwardly applicable in the countervailing duty context. *Id.*

In particular, where the mandatory respondents in a given review do not use a subsidy program that a previously-examined non-selected company has been found to use, then the mandatory respondents' rates cannot be presumed to reflect the non-selected company's subsidy usage. *Id.* Here, Commerce found that neither Icdas nor Kaptan purchased natural gas from the Turkish government during the 2017 review period. *Id.* Colakoglu, however, was found in the immediately preceding review to be benefiting directly from such purchases, at an above-*de minimis* level. *Id* at 34-35.[2] Colakoglu had also been found to use the natural gas subsidy program in other segments of the proceeding, establishing a multi-period history of program use. *Id.* at 35. Commerce accordingly found that the *de minimis* rates calculated for Icdas and Kaptan as non-

---

2 Commerce's determination of Colakoglu's 2016 subsidy rate attributable to the company's purchase of government-supplied natural gas was recently upheld by this Court. *See Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, No. 19-00149, slip op. 21-20 at 36 (Ct. Int'l Trade Feb. 19, 2021). Further, the appeal deadline has passed without any notice of appeal.

users of the natural gas subsidy program would not be reasonably reflective of Colakoglu's net subsidy rate. *Id.*

In the final results, Commerce continued to pull forward Colakoglu's 1.82% net subsidy margin from the immediately preceding review. This appeal followed.

## III. SUMMARY OF ARGUMENT

This Court should affirm Commerce's determination of the net subsidy rate for Colakoglu in the 2017 administrative review. The Tariff Act of 1930 gives Commerce flexibility to use any "reasonable" method to determine margins for non-selected respondents where all of the individually-examined companies' net subsidy rates are zero or *de minimis*. While Congress provided an "expected method" for determining non-selected companies' antidumping duty margins, it did not provide such a method in the countervailing duty context, for good reason. Commerce's methodology was thus in accordance with law.

Beyond this, Commerce made the factual findings necessary to support its chosen methodology. Specifically, it found that Colakoglu's above-*de minimis* net subsidy rate in the 2016 review was almost entirely based on the company's use of a subsidy program used by neither of the individually examined respondents in the 2017 review. Moreover, Colakoglu had been found to use this program over multiple prior review periods.

## IV. ARGUMENT

This Court should affirm Commerce's methodology for determining Colakoglu's net subsidy rate, as a non-selected respondent, in the 2017 review. As Commerce explained, Colakoglu's claims are based in legislative history specific to the calculation of non-selected companies' margins in antidumping duty proceedings. Final IDM at 33-34. The relevant legislative sources treat countervailing duty proceedings separately, and do not impose the same restrictions and requirements on Commerce's selection of net subsidy rates for non-selected companies in such

proceedings. *Id.* Further, Commerce's methodology was reasonable overall. Neither of the individually examined companies in the 2017 review were found to use the program through which Colakoglu had obtained above-*de minimis* countervailable benefits in the immediately preceding review. *Id.* at 34. Moreover, Colakoglu had been found to use this program across multiple prior reviews. *Id.* at 35.

Colakoglu nonetheless challenges Commerce's methodology, citing two main grounds. First, Colakoglu argues that Commerce's methodology is not in accordance with law. Colakoglu's Brief at 5-8. Second, Colakoglu argues that Commerce did not make the factual findings necessary to justify its methodology in this case. *Id.* at 8-10. As further explained below, however, neither argument is compelling.

**A. Commerce's Methodology Is in Accordance with Law**

The Tariff Act of 1930 states that, in determining the net subsidy rate for non-selected respondents in countervailing duty investigations, the rate shall be the weighted-average of the rates determined for individually-examined respondents, excluding rates that are zero, *de minimis*, or determined entirely using the facts available. 19 U.S.C. § 1671d(c)(5)(A)(i). Where the individually-examined respondents' margins are all zero, *de minimis*, or determined using the facts available, Commerce may use "any reasonable method" to determine the net subsidy rate for non-examined respondents. *Id.* § 1671d(c)(5)(A)(ii). In the review at bar, where the individually-investigated respondents' margins were *de minimis*, and those respondents did not use subsidy programs that Colakoglu had previously been found to benefit from, Commerce determined that a "reasonable method" for determining Colakoglu's net subsidy rate was to bring forward the rate determined for it as an individually-examined respondent in the immediately preceding review. Final IDM at 33-35.

Colakoglu argues that this methodology was not in accordance with law. Colakoglu's Brief at 5-8. The company begins by noting that the Tariff Act of 1930's provisions regarding the determination of non-selected companies' margins and net subsidy rates in antidumping and countervailing duty proceedings are nearly identical. *Id.* at 6 (citing 19 U.S.C. §§ 1671d(c)(5)(A)(ii) & 1673d(c)(5)(A)). Colakoglu further notes that the SAA, in describing how non-selected companies' margins are to be determined in antidumping duty proceedings, states that the "expected method" will be to average the zero, *de minimis*, and facts-available rates. *Id.* at 6-7. The SAA states that Commerce should depart from the "expected method" only if it is not feasible or would not produce a dumping margin "reasonably reflective" of non-selected companies' dumping margins. *Id.* at 7 (quoting SAA at 873, 1994 U.S.C.C.A.N. at 4201).

Quoting Federal Circuit precedents involving Commerce's calculation of antidumping duty margins, Colakoglu argues that Commerce was required to use the "expected method" in determining the company's net subsidy rate here. *Id.* at 7-8 (quoting *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017); *Albemarle Corp.*, 821 F.3d at 1353-55). Colakoglu also argues that the mandatory respondents' subsidy usage during 2017 should be presumed to be representative of Colakoglu's 2017 subsidy usage. *Id.* Finally, Colakoglu argues that Commerce deviated from its past practice in bringing forward the company's 2016 net subsidy rate, stating that Commerce used the "expected method" to determine non-selected companies' net subsidy rates in the 2014 administrative review. *Id.*

Colakoglu's arguments are unavailing. First, while the statutory language for determining non-selected companies' margins/rates is nearly identical with respect to antidumping and countervailing duty proceedings, that language does not require use of any specific method for determining the non-selected companies' rates where the individually-examined companies

receive *de minimis* margins. *See* 19 U.S.C. §§ 1671d(c)(5)(A) & 1673d(c)(5)(A). Second, as Commerce explained in its Final IDM, while the SAA describes an "expected method" for determining non-selected companies' margins in antidumping duty proceedings, it does not do so with respect to countervailing duty proceedings. Final IDM at 33 (quoting SAA at 873, 942, 1994 U.S.C.C.A.N. at 4201, 4251). Given that the statutory language does not otherwise specify a required methodology, Commerce did not act in a manner contrary to law in recognizing and applying the distinct treatment indicated in the SAA.

Further, the Federal Circuit precedents on which Colakoglu relies are not apposite. Both *Changzhou Hawd* and *Albemarle Corp*. involved antidumping duty proceedings, not countervailing duty proceedings. *See Changzhou Hawd*, 848 F.3d at 1006; *Albemarle Corp.*, 821 F.3d at 1345.[3] As Commerce explained, the SAA's "expected method" direction is aimed at antidumping duty proceedings, but no similar direction is provided with respect to countervailing duty proceedings. Final IDM at 33-34. Rather, both the statutory text and the SAA indicate that Commerce is authorized to freely choose any "reasonable method" for determining non-selected companies' net subsidy rates in countervailing duty proceedings. *Id.*

This is for good reason. As Commerce explained, antidumping and countervailing duty proceedings address different types of behavior. *Id.* at 34. Further, the determination of antidumping duty margins and net subsidy rates is qualitatively different. The former results from a comparison of U.S. prices against home-market prices for the same good, with the price difference constituting the dumping margin. *See, e.g.*, 19 U.S.C. § 1677b(a); *id.* § 1677f-1(d). By

---

[3] *Changzhou Hawd* also involved the antidumping duty margin assigned to non-selected respondents who had never been previously reviewed; Commerce therefore had no individualized information regarding their dumping behavior. *Changzhou Hawd*, 848 F.3d at 1006. Here, of course, Colakoglu was previously individually-examined; Commerce accordingly did have information regarding Colakoglu's specific subsidy usage.

contrast, a net subsidy rate is determined by building up subsidy benefits obtained through a company's use of individual subsidy programs. *See, e.g.*, *id.* § 1677(5). Because different companies operating in the same country may use entirely different programs, Commerce may have information indicating that the subsidy benefits accruing to one company are not a reasonable proxy for the benefits accruing to another. Final IDM at 34. Here, for example, the evidence available to Commerce indicated that Colakoglu had used, over multiple review periods, qualitatively different subsidy programs than those used by the examined respondents during 2017. *Id.* at 34-35. Commerce accordingly acted reasonably by not treating the individually-examined companies' subsidy program usage as reflective of Colakoglu's subsidy program usage. This is so even though the individually-examined companies were the highest-volume exporters in 2017. While this made them "representative" as a general matter, it did not make their experience representative of Colakoglu's experience in particular, given facts showing distinctions in the companies' subsidy usage.

Finally, Colakoglu does not persuade that Commerce has impermissibly deviated from past practice here. While it argues that, in the 2014 administrative review of the order, Commerce used the "expected method" to derive the rates for non-selected companies, Colakoglu's Brief at 7-8, Commerce did not use this method in the 2015 or 2016 reviews. *See* 2016 Review Notice, 84 Fed. Reg. 36,052; 2015 Review Notice, 83 Fed. Reg. 16,053. Moreover, even if the 2014 administrative review could be considered, on its own, to establish a "practice," that practice is not germane to the situation at bar, given the facts of the 2014 review.

In the 2014 review, none of the non-selected respondents had previously been individually-examined. *Compare* 2014 Review Notice, 82 Fed. Reg. at 26,908, *with Steel Concrete Reinforcing Bar From the Republic of Turkey*, 79 Fed. Reg. 54,963, 54,964 (Dep't Commerce Sept. 15, 2014)

(final affirmative countervailing duty deter. final affirmative critical circumstances deter.). As such, Commerce had no evidence available to it that would indicate that the mandatory respondents' 2014 subsidy usage was not a reasonable proxy for the non-examined respondents' usage.

Moreover, even if the 2014 review were apposite (and was sufficient to establish a past practice on its own), Commerce is entitled to deviate from past practice so long as it provides a reasoned basis for the deviation. *See, e.g.*, *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003). Here, Commerce provided such a basis. Specifically, Commerce explained that antidumping and countervailing duty proceedings address distinct trade practices, and that, given that neither of the individually-examined respondents in the 2017 review used the subsidy program from which Colakoglu had received the majority of its subsidy benefits in the 2016 review, it would be unreasonable to presume that an average of their *de minimis* margins provided a reasonable proxy for Colakoglu's likely 2017 net subsidy rate. Final IDM at 34-35.

In sum, Colakoglu does not persuade that Commerce's methodology was incorrect as a matter of law. Rather, Commerce's methodology for determining Colakoglu's net subsidy rate as a non-selected respondent was reasonable in light of the distinct treatment of such determinations in the SAA and the information available to the agency with respect to Colakoglu's subsidy usage. Accordingly, this Court should uphold Commerce's methodology.

**B. <u>Commerce's Methodology Is Supported by the Requisite Factual Findings</u>**

Colakoglu next challenges Commerce's methodology as unsupported by necessary factual findings. Colakoglu's Brief at 8-10. Specifically, Colakoglu argues that the agency has not justified its deviation from the "expected method" by showing that Colakoglu's experience during the 2017 review period was distinct from that of Kaptan and Icdas. *Id.* at 8-9. Colakoglu argues that the only record data regarding its 2017 subsidy experience was its request for an administrative review and

that, without more, this record data does not support a finding that Colakoglu used and benefitted in 2017 from the program from which it was found to have benefitted in 2016. *Id.* at 9. Colakoglu also argues that it was found not to have benefitted from that same program in 2015. *Id.* Colakoglu therefore argues that its past subsidy history indicates that an average of the *de minimis* margins determined for Kaptan and Icdas was reasonably reflective of Colakoglu's 2017 experience. *Id.*

Colakoglu's arguments are without merit. As an initial matter, Colakoglu's claims presume that the "expected method" that Congress prescribed for antidumping duty proceedings is applicable to countervailing duty proceedings. As discussed above, it is not.

Colakoglu argues that the only record data regarding its 2017 subsidy usage was its request for an administrative review. *Id.* But the fact that Colakoglu requested a review does not indicate that it ceased using, in 2017, the natural gas subsidy program that it had been found to use in both the 2015 and 2016 reviews. Further, Colakoglu did not seek voluntary respondent status in this review, or make any attempt to place information on the record to demonstrate that it did not use this program in 2017. Thus, Commerce reasonably concluded that the information available to it indicated that the *de minimis* margins calculated for Kaptan and Icdas without reference to the natural gas subsidy program were not an appropriate proxy for Colakogu's 2017 subsidy usage.

Colakoglu argues that, because it received a *de minimis* margin as an individually-examined respondent in the 2015 review, Commerce had no basis to find a *de minimis* margin unlikely to reflect the company's 2017 experience. But, as Commerce explained, the agency found that Icdas and Kaptan did not use, during 2017, the subsidy program that formed the basis for almost all of Colakoglu's 1.82% subsidy rate in the 2016 review. Final IDM at 34-35. Moreover, Colakoglu had used this program in two reviews in which it had been individually examined, *i.e.*,

in both 2016 and 2015. *Id.*[4] The information reasonably available to the agency thus indicated that Colakoglu and the examined respondents used, and benefitted from, distinct subsidy programs.

In this regard, RTAC also notes that while neither Kaptan nor Icdas used the natural gas program in 2017, it was used in 2017 by a Turkish rebar company subject to a separate countervailing duty order, and was found to provide countervailable benefits during that year. *See* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) (final results of countervailing duty admin. rev.; 2017) at 4. As such, Commerce reasonably concluded that the *de minimis* rates calculated for Kaptan and Icdas, which did not reflect this program, did not provide a reasonable proxy for Colakoglu's likely 2017 net subsidy rate.

---

[4] While Colakoglu was not found to have benefitted from the program in 2015, this was not because Colakoglu did not use the program, but because the price that Colakoglu paid to the Turkish government for natural gas in 2015 was deemed to provide adequate remuneration. *See* Issues and Decision Memorandum accompanying 2015 Review Notice at 5.

## V. <u>CONCLUSION</u>

For the reasons detailed above, RTAC respectfully requests that this Court affirm Commerce's selection of the net subsidy rate for Colakoglu in the 2017 review of the countervailing duty order on Turkish rebar.

Respectfully submitted:

*/s/ Alan H. Price*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.

**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: May 13, 2021

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Rebar Trade Action Coalition's Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 3,924 words.

*/s/ Alan. H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Rebar Trade Action Coalition
(Representative Of)

May 13, 2021
(Date)